IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

*ORIGINAL*

MARLIN ENOS NELSON,
   Petitioner

VS.

JANIE COCKRELL, Director,
Texas Department of Criminal Justice -
Institutional Division,
   Respondent

NO. MC 02-319

UNITED STATES COURTS
SOUTHERN DISTRICT OF TEXAS
FILED

AUG 2 2 2003

Michael N. Milby, Clerk of Court

# H-03-3742

## PETITION FOR WRIT OF HABEAS CORPUS

Marlin Enos Nelson, currently confined on death row in the Texas Department of Corrections, petitions this court to issue a writ of habeas corpus ordering that his conviction for capital murder and his death sentence be vacated.

## INTRODUCTION

1.      Marlin Enos Nelson, was nineteen years old when he was indicted by a Harris County, Texas grand jury for the 1987 capital murder of James Randle Howard. The indictment alleged that Mr. Nelson had killed Mr. Howard in the course of committing a robbery. A jury convicted Mr. Nelson of capital murder on August 10, 1988.

2.      Because of the many constitutional defects in Mr. Nelson's trial, direct appeal and state habeas corpus proceedings, his conviction and death sentence cannot stand. Therefore, Mr. Nelson is being illegally restrained in his liberty by the Institutional Division of the Texas Department of Corrections.

## PRIOR PROCEEDINGS

3.      Marlin Enos Nelson is being unlawfully incarcerated on death row at the Terrell Unit of the Texas Department Of Criminal Justice, Institutional Division, in Livingston, Texas, pursuant to a judgment of conviction of capital murder and sentence of death imposed on August 10, 1988, by the 178th District Court of Harris County, Texas. Mr. Nelson is indigent, and has been granted the right to proceed in forma pauperis in this Court.

4.      On November 24, 1987, a Harris County Grand Jury returned an indictment against Marlin Enos Nelson for the Capital Murder of James Howard while in the course of committing the felony offense of robbery. Mr. Nelson was indigent and the trial court appointed Joe Bailey and Robert Loper to represent him.

5.      On August 3, 1988, Mr. Nelson was convicted of capital murder by a Harris County jury in the 178th Judicial District Court, Harris County, Texas.

6.     After a separate sentencing hearing, the jury returned affirmative answers to the special issues submitted to it by the trial judge under the provision of Tex. Code Crim. Proc. Art. 37.071. The trial judge accordingly imposed a sentence of death on August 10, 1988.

7.     On May 15, 1992, the Court of Criminal Appeals affirmed Mr. Nelson's capital murder conviction and death sentence on direct appeal. He did not request a rehearing.

8.     Stephen Morris of Houston, Texas represented Mr. Nelson on the post-conviction application for writ of habeas corpus which was filed in the 178th District Court of Harris, County, Texas and with the Court of Criminal Appeals on October 13, 1998.

9.     Respondent's (state's) Proposed Findings of Fact and Conclusions of Law were adopted verbatim by the state district court and forwarded to the Court of Criminal Appeals by order dated July 8, 2002.

10.     The Court of Criminal appeals denied Mr. Nelson's petition for a writ of habeas corpus by an unpublished ordered dated September 11, 2002.

## STATEMENT OF MATERIAL FACTS

11.     The material facts at issue in this petition have been incorporated into discussion of each claim for relief.

## STATEMENT OF JURISDICTION

12.     This court has subject matter jurisdiction of this case by virtue of the conviction and sentence of Mr. Nelson having occurred in Harris County, Texas. See 28 U.S.C. § 2241 (d).

## EXHAUSTION OF REMEDIES

13.    All claims presented in this petition have been exhausted in state court through the state habeas petition process.

### NO DEFERENCE TO STATE COURT FACT FINDING IS REQUIRED WHEN THE STATE COURT PROCEEDINGS ARE NOT FULL AND FAIR

**A.    Preliminary Statement Regarding the Application of 28 U.S.C. § 2254 (D) to this case**

14.    Although prior state court litigation in a criminal case may often require federal deference to state court fact-findings, See 28 U.S.C. § 2254 (d), such deference is not required with respect to questions of law or "mixed questions" of law and fact, and is required with respect to fact findings only when the state court hearing was "full and fair." See Sumner v. Mata, 449 U.S 539 (1981). Section 2254 recognizes numerous situations when a state court hearing would not be "full and fair." See 28 U.S.C. § 2254 (d) (1)-(8). When a state court hearing is inadequate under § 2254 (d), a federal habeas court is required to make de novo factual findings. Furthermore, when there are genuine issues of material facts and the state court fact-findings are not entitled to § 2254 (d) deference, a federal evidentiary hearing is required. See Guice v. Fortenberry, 661 F. 2d 496, 500-01 (5th Cir. 1981) (en banc) ("[i]f the facts necessary to support [a] constitutional challenge are disputed" and "if no . . . [full and fair] hearing has been held in state court," a federal "evidentiary hearing is essential to the resolution of the claim"); Townsend v. Sain, 372 U.S. 293 (1963).

**B.  No "Full and Fair" Evidentiary Hearing was Conducted In The State Court System**

15.     In this case, no evidentiary hearing on Petitioner's constitutional claims was

conducted in the Texas court system. Under well established Fifth Circuit precedent, a

federal habeas court may not afford § 2254 (d) deference to the factual findings entered by

Judge Harmon.

16.     Judge Harmon did not allow discovery or conduct an evidentiary hearing. The

findings of facts made by Judge Harmon were simply based on his purported "review" of

the filings of Petitioner and Respondent.  Therefore, under Guice v. Fortenberry, supra,

and Townsend v. Sain, supra, this Court will be required to conducted an evidentiary

hearing on Petitioner's complex and multi- faceted claims and enter de novo factual

findings.

**C.  The State Trial Court's Ghost-Written Findings of Fact Are Incomplete And, Thus, Warrant No Deference Under 28 U. S. C. § 2254 (D) (1)**

17.     Even assuming arguendo that this Court otherwise were inclined to defer to the

state habeas trial court's findings, this Court would still be required to conduct a federal

evidentiary hearing on many of Petitioner's allegations because the state trial court simply

did not address many pivotal factual issues. See 28 U.S.C.  § 2254 (d) (1). The state trial

court's "findings" – which were ghost-written by counsel for the State  -- are nothing but

cursory statements unsupported by the trial record. As the discussion of Petitioner's

various allegations will reveal (see infra), the majority of Petitioner's specific allegations

were not addressed by the state courts.

18.     In sum, because this petition present numerous genuine issues of material facts that were either unresolved in the state court proceedings or were resolved in a manner that does not warrant § 2254 (d) deference by the federal courts, this court must conduct a full and fair evidentiary hearing. See Guice v. Fortenberry, 661 F.2d 496, 500 01 (5th Cir. 1981) (en banc) (" If the facts necessary to support [a] constitutional challenge are dispute," and "if not...[full and fair] hearing has been held in state court," a federal "evidentiary hearing is essential to the resolution of the claim"); Townsend v. Sain, 372 U.S. 293 (1963).

**ISSUE NUMBER 1**

**THE EVIDENCE WAS INSUFFICIENT TO CONVICT MR. NELSON OF
ROBERRY WHEN HE CAUSED THE DEATH OF RANDY HOWARD IN
VIOLATION OF HIS RIGHTS UNDER THE EIGHTH AMENDMENT AND
THE DUE PROCESS AND EQUAL PROTECTION CLAUSES OF THE
FOURTEENTH AMENDMENT.**

19.     The evidence was insufficient to prove that Nelson murdered Howard in the course of committing or attempting to commit robbery as required for a finding of guilt under the court's charge to the jury.

20.     In order for Mr. Nelson's conduct to be in the course of committing robbery, it was incumbent upon the state, at a minimum, that he form the intent to take Howard's property before he killed him.

21.     While Nelson admitted he killed Howard and took items from the apartment, he did not admit to killing Howard before, during, after or in flight from taking the car and other property.

22.     At the guilt innocence phase of Mr. Nelson's trial, the only direct evidence presented by the prosecution were the two voluntary statements provided by Mr. Nelson. Neither of these statements provided information or an explanation or was direct evidence

of the intent to commit a theft from Mr. Howard or that Mr. Nelson was in the course of committing theft prior to Mr. Howard's murder pursuant to Tex. Penal Code art. 19.03 (a)(2)(1974).

23. There was no evidence establishing a forced entry into Howard's apartment. In fact, given the evidence it appears that Howard invited Nelson into the apartment. There was no evidence of any plan to commit robbery before Nelson entered the apartment. The evidence does suggests that Howard invited Nelson over to the apartment for consensual sex. There was no evidence that Howard and Nelson had previously met.

24. At the time of the killing, a rational trier of fact could not determine Nelson's intent with regards to the robbery, beyond a reasonable doubt.

25. Texas courts are in agreement that the point at which Nelson formulated his intent to take Howard's property is critical to differentiating, between the commission of capital murder in the course of robbery and the commission of a first degree murder, followed by theft from a corpse, a third degree felony. Alverado v. State, no. 71779, (Tex.Crim.App.1995).

26. Proof of a robbery committed as an after thought and unrelated to a murder will not provide sufficient evidence of capital murder. Robertson v. State, 871 S.W. 2d 705 (Tex.Crim.App. 1993). If there is evidence from which the jury could conclude that the defendant formed the intent to obtain or maintain control of the victim's property either before or during the commission of the murder, then the state has proven their case. The jury may infer the requisite intent from the conduct of the defendant.

27. When considering the sufficiency of the evidence to support a guilty verdict, this court must view the evidence in the light most favorable to the verdict in order to determine whether any rational trier of fact could have found all of the essential elements of the crime beyond reasonable doubt. Jackson v. Virginia, 99 S.Ct. 2781(1979).

28. In examining the evidence as a whole, a ration trier of fact could not conclude beyond a reasonable doubt that Nelson formed the intent to obtain or maintain control of the property either before or during the commission of the murder. The only reasonable

conclusion based on the available evidence is that Nelson entered Howard's apartment by invitation. He walked around the apartment and killed Howard after consensual sex, then as an after thought, decided to flee in Howard's car and take some of his property from the apartment as well. This is the only reasonable inference to be drawn from the evidence.

29.     In applying constitutional consideration to the capital sentencing procedures employed by the court at Mr. Nelson's capital murder trial, it is apparent that the failure to provide sufficient evidence of robbery violated both the Fourteenth Amendment and the Eighth Amendment. <u>Jackson v. Virginia,</u> 99 S.Ct. 2781 (1979).

30.     In order to obtain a conviction that a capital defendant allegedly committed the underlying offense of robbery, the Texas courts merely require some evidence of the theft, however slight, connect the defendant to the murder. The prosecution need only argue that the proffered evidence of theft occurred not that the evidence established a mental intent to commit robbery before or during the commission of the murder as the legislature had intended. " Under our system of a criminal justice even a thief is entitled to complain that he has been a unconstitutionally convicted and imprisoned as a burglar. <u>Jackson v. Virginia, supra.</u>

## ISSUE NUMBER 2

### MR. NELSON RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL DURING THE PUNISHMENT PHASE OF HIS TRIAL AS TRIAL COUNSEL FAILED TO INVESTIGATE AND INTRODUCE EVIDENCE OF CHILDHOOD ABUSE, IN VIOLATION OF MR. NELSON'S RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE U. S. CONSTITUTION.

31.  Marlin Enos Nelson was eleven years old when he was abducted at the rear of a convenient store by a stranger who brutally raped and sodomized him. (PreTr. II at 315-316). It was no surprise that around the same time, his mother noted that her son, who never gave her problems before, was now having behavioral issues. (PV II at 376).

32.  Mr. Nelson is a male Caucasian born in Mississippi on July 7, 1968. (PreTr. V at 614). The family moved to Texas about the time he was one year old. Mr. Nelson was one of nine children. (PV II at 366-367). At the time he was born, his father was in prison for robbery. When he got out, he would physically abuse Mr. Nelson's mother and siblings. Mr. Nelson's mother recalled a time when Marlin still a baby, watched his father force his older sister Cindy and older brother Danny, place their hands on a chair and spread their legs out while he would beat them. When one year old Marlin tried to stop his father, his father beat him. (PV II at 371).

33.  Mr. Nelson's father, a cocaine addict, took Marlin out with him and had him hang out on the streets. Incarcerated again, the family went into hiding and Marlin Nelson did

1

not see his father again. (PV II at 374). Eventually, Mr. Nelson's father died of liver disease. (PV II at 376).

34.     Mr. Nelson's mother remarried. Although he did not abuse the children, Mr. Nelson's stepfather ignored them. (PV II at 379-380).

35.     After the trauma of the rape, Mr. Nelson was not able to tell anyone what happened. Marlin Nelson was too ashamed. Even though he was the victim of the offense, he feared being castigated by everyone as homosexual. (PreTr II at 315-416).

36.     Often the case with victims of sexual assault, the shame prevented him from reporting the incident and seeking help. Marlin's rage went untreated and a couple years later, Mr. Nelson was arrested for a brutal assault on a homosexual, Rufus Wilcox, with whom he had a homosexual encounter. Mr. Nelson was 13 at the time. Mr. Nelson received a juvenile conviction for the offense of attempted capital murder and was sent to Giddings School.

37.     During his incarceration at Giddings, Marlin Nelson did not receive any professional psychiatric help. On the contrary, the professionals who were trained to detect adolescent mental and emotional problems and issues failed to respond or help him.

38.     The first trained professional who interviewed him, Dr. Smith, spent all of 45 minutes assessing Mr. Nelson. (PV II at 221). During that time, Mr. Nelson was very candid about the details of the offense for which he was convicted (PV II at 185). At the end of the "screening", Dr. Smith concluded that Mr. Nelson did not need any further

2

psychiatric evaluation or treatment and saw no reason to refer him for help. He reasoned that Nelson did not exude sufficient remorse for his conduct and did not try and deny his guilt. (PV II at 185, 190, 198). In other words, Mr. Nelson did not seem to appreciate the wrongfulness of his conduct and so Dr. Smith gave up on Mr. Nelson after 45 minutes. (PV II at 221).

39.    On his own, Mr. Nelson requested that he see another psychiatrist. On May 23, 1984, Nelson saw Dr. Jim Phillips. Dr. Phillips also spent 45 minutes with Nelson. (PV II at 228). Dr. Phillips found no evidence of psychotic thinking but believed he suffered from a conduct disorder stemming from childhood. (PV II at 232). Again, Mr. Nelson was very honest with Dr. Phillips and told him dreams of killing people. Dr. Phillips, clearly not impressed, saw Mr. Nelson the one time. Mr. Nelson never received any further psychiatric treatment.

40.    When Mr. Nelson was released from the Texas Youth Commission, he went to live with his mother. During this period, Mr. Nelson continued his use of drugs. (PV II at 381). Eventually he moved out and started living with his fiancée and his older sisters. At the time of trial, Mr. Nelson was married and had a son. (PV II at 386).

41.    After his release from the Giddings school and before he became incarcerated for the present offense, Mr. Nelson managed to obtain his GED, maintain employment, and establish friendships with the few people who testified on his behalf at trial.

42.    Two of his acquaintances, Dorothy Stout and Kathleen Cannon knew Nelson for about three years. (PV II at 400). Mr. Nelson was welcomed around their homes, and

3

was even trusted to help on work deliveries that involved payroll moneys. (PV II at 353-359, 394) They never saw anything violent in Mr. Nelson and believed he was not beyond redemption. (PV II at 360, 403, )

43.     His prior employer, Mr. J.G. Saul hired Marlin for approximately six month in 1987 to assist with his ceramic tile work. (PV II at 427). Saul stated that Marlin was an above average employee, Saul aware of Marlin's prior criminal history never saw any violence in the workplace. (PV II at 437).

44.     Mr. Nelson continued to abuse drugs after his release. Mr. Nelson started abusing marijuana around the age of 11. Marlin Nelson was able to obtain drugs at Giddings and continue his habit there. He was able to obtain crystal methamphetamine and cocaine. Mr. Nelson's sister Cindy helped him obtain said drugs. (PreTr VII at 882-883).

45.     The night he was arrested for the capital murder, Mr. Nelson had been using drugs. He had also been using drugs at the time of the commission of the offense. (PreTr VI at 764).

46.     After his arrest, Mr. Nelson became suicidal. When the police informed Mr. Nelson his wife was coming to see him later that morning, his response was "Good, then I'll be dead right after that." (PreTr II at 299-300). During his incarceration, Marlin confessed to the murder of another homosexual victim, Manuel Juarez on August 17, 1987. Those circumstances also involved a brutal assault.

4

47.    The sergeant who obtained the confession from Mr. Nelson on the Juarez murder was the first to uncover the fact that Mr. Nelson had been raped when he was 11 years old. (PreTr II at 315-316, 320). Mr. Nelson became very emotional when he revealed this incident to Sergeant Burmeister who in turn revealed that he was a victim of a sexual assault as a child. (PreTr VIII 1010). Unfortunately, the details of this encounter were only heard during a pretrial hearing and the jury did not have the opportunity to hear about the rape during punishment.

The jury only heard the following excerpt from his confession:

> When I hit him, I thought about what happened when I was 11 years old and I was molested. I never told anyone about it but I wanted to in the past. I always wanted to tell my sisters but never did. I wanted to tell my brother but never did because I didn't want him to look at me like I was a faggot. I'd been hating queers ever since that happened.

(Ex. Volume III at 336).

48.    Trial counsel was well aware that Mr. Nelson had been raped and sodomized as a child from the statements made in the confession as well as the pretrial hearing..[1] However, trial counsel failed to investigate this claim or introduce any evidence as to the mitigating aspect of the rape. He also failed to request that an independent psychiatrist be

---

[1] When I hit him, I thought about what happened when I was 11 years old and I was molested. I never told anyone about it but I wanted to in the past. I always wanted to tell my sisters but never did. I wanted to tell my brother but never did because I didn't want him to look at me like I was a faggot. I'd been hating queers ever since that happened.

(PV II at 102). *See also* Pretrial Transcripts Volume 2, 315-316 (Mr. Nelson voluntarily confided in the police officer that when he was 11 years old, he was at a convenience store and a "nigger" dragged him behind the store and raped him and sodomized. He told the police officer the he was the first person he ever told that to. Mr. Nelson always wanted to tell it to his sister and this brother but he was afraid they might think he was a "faggot" because of that. The police officer stated that Mr. Nelson told him that is why Mr. Nelson hated queers.

appointed to perform an evaluation to determine what effect the rape had on Mr. Nelson. Finally, trial counsel failed to present before the jury, the same testimony established in pretrial regarding the confessions and the rape. These failings would have explained the psychological effect the childhood assault had on Mr. Nelson and would have enabled the jury to understand how Mr. Nelson's violent conduct was an impulsive and uncontrollable reaction to the childhood trauma for which he never received treatment.

49.     Evidence in the records suggests that Mr. Nelson's violent acts were committed against homosexuals, usually after engaging in homosexual acts with them. Without any explanation, these facts prejudiced Mr. Nelson and served as aggravating rather than mitigating, factors.


1.     <u>Death Penalty Jurisprudence Under the 8th Amendment</u>

50.     The death penalty is an extreme and irrevocable form of criminal punishment. "There is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). In capital cases, the finality of the sentence imposed warrants protections that may or may not be required in other cases. *Ake v. Oklahoma*, 470 U.S. 68, 87 (1985)(Burger concurring).

"Because sentences of death are "qualitatively different" from prison sentences, this Court has gone to extraordinary measures to ensure that the prisoner sentenced to be executed is afforded process that will guarantee, as much as is humanly possible, that the sentence was not imposed out of whim, passion, prejudice, or mistake." *Eddings v. Oklahoma*, 455 U.S. 104, 117-118 (1982)

51.     As a result, the Supreme Court has repeatedly condemned sentencing procedures that inject unreliability into jury deliberations in the capital punishment case. *See e.g., South Carolina v. Gathers*, 109 U.S. 2207 (1989); *Johnson v. Mississippi*, 486 U.S. 578 (1988); *Caldwell v. Mississippi*, 472 U.S. 320 (1985); *Booth v. Maryland*, 481 U.S. 496 (1987); *Garner v. Florida*, 430 U.S. 349 (1977).

       2.     Ineffective Assistance Of Counsel

52.     The constitutional standard for judging the effectiveness of counsel under the sixth amendment is two prong-test, requiring the petitioner to show: 1) counsel's performance was so "deficient," that is, that counsel did not provide "reasonably effective assistance," and that 2) counsel's error prejudiced the defense by depriving the defendant of a fair trial whose result is reliable." An attorney is ineffective if he "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). "Prejudice is established if, but for counsel's error, there is a "reasonable probability" that the result of the proceeding would have been different. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

       a)  Counsel's Performance Was Deficient

53.     Prevailing norms of practice as reflected in the American Bar Association standard can serve as guidelines for determining reasonableness. *Strickland*, 466 U.S. at 687. The standards set for counsel's duty to investigate in preparation for sentencing are even more critical:

7

The lawyer has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the Court at sentencing. This cannot effectively be done on the basis of broad emotional appeals or on the strength of statements made to the lawyer by the defendant. Information concerning the defendant's background, education, employment record, mental and emotional stability, family relationships and the like will be relevant, as will mitigating circumstances surrounding the commission of the offense. Investigation is essential to the fulfillment of those functions.

American Bar Association, *Standard for Criminal Justice: The Defense Function, Standard 4-4.1, commentary*, at 4-55 (2d Ed. 1980).

54.     These standards were most recently reaffirmed in *Wiggins v. Smith*, 123 S.Ct. 2527 (2003). The Supreme Court reversing the lower court which had found that trial counsel's decision not to put on evidence of mitigation was a tactical decision, held that trial counsel failed to conduct a sufficient investigation to unearth facts from which a tactical decision could be made.

55.     In *Wiggins*, the court found that even though the trial attorney was aware of some of defendant's background through the sentencing investigation and the social services records, this information alone did not provide a reasonable basis upon which to make the decision of trial strategy. To the contrary, the information in those sources should have established to any reasonable trial attorney that further investigation would be required to uncover the factors that were later brought to light in the habeas, mainly of severe child hood physical and sexual abuse through family, foster care, and further counseling.

8

56.     The Court compared Wiggins' counsel's decision to limit the scope of their

investigation into potential mitigating evidence to the one in *Strickland.* The Court noted

as follows:

> In rejecting Strickland's claim, we defined the deference owed such
> strategic judgments in terms of the adequacy of the investigations
> supporting those judgments:
> "[S]trategic choices made after thorough investigation of law and
> facts relevant to plausible options are virtually unchallengeable; and
> strategic choices made after less than complete investigation are reasonable
> precisely to the extent that reasonable professional judgments support the
> limitations on investigation. In other words, counsel has a duty to make
> . reasonable investigations or to make a reasonable decision that makes
> particular investigations unnecessary. In any ineffectiveness case, a
> particular decision not to investigate must be directly assessed for
> reasonableness in all the circumstances, applying a heavy measure of
> deference to counsel's judgments." *Strickland* at 690, 691.

57.     *Wiggins* relied heavily on the principles espoused in *Williams v. Taylor*, 529 U.S.

362 (2000) - as illustrating the proper application of these standards.  The Court found

Williams' ineffectiveness claim meritorious by applying *Strickland* and concluded that

counsel's failure to uncover and present voluminous mitigating evidence at sentencing

could not be justified as a tactical decision to focus on Williams' voluntary confessions,

because counsel had not "fulfill[ed] their obligation to conduct a thorough investigation

of the defendant's background." *Williams,* 529 U.S. at 396 (citing 1 ABA Standards for

Criminal Justice 4-4.1, commentary, p. 4- 55 (2d ed.1980)).

58.     In highlighting counsel's duty to investigate, and in referring to the ABA

Standards for Criminal Justice as guides, the Court applied the same "clearly established"

precedent of *Strickland* applied in *Wiggins.*  Thus, the inquiry is not whether counsel

should have presented a mitigation case, but rather, whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background *was itself reasonable.* In assessing counsel's investigation, we must conduct an objective review of their performance, measured for "reasonableness under prevailing professional norms," which includes a context-dependent consideration of the challenged conduct as seen "from counsel's perspective at the time." *Strickland,* 466 U.S. at 688, 689. Further, it is, as the Court explained, not the quantum of evidence known but whether the known evidence would lead a reasonable attorney to investigate further.

59.     Trial counsel has a duty to investigate an avenue first before deciding whether to forgo such an avenue. *See Thomas v. Kemp,* 796 F.2d 1322, 1324 (11th Cir. 1986). It stands to reason that the only way to make an informed decision and conduct meaningful discussion with client on realities of the case. *Mitchell v. Kemp,* 762 F.2d 886, 889 (11 Cir. 1987); *Strickland, supra.* See also *Horton v. Zant,* 941 F.2d 1449, 1462 (11th Cir. 1991) (Mitigation evidence, when available, is appropriate in every case where the defendant is placed in jeopardy of receiving the death penalty. To fail to do any investigation because of the mistaken notion that mitigating evidence is inappropriate is indisputably below reasonably professional norms.); *Davis v. Alabama,* 596 F.2d 1214, (1979) (Trial counsel was ineffective for failing to investigate and present evidence of insanity defense.)

60.     Similarly, federal courts have held that the failure to investigate and present expert testimony of mental health issues is ineffective. *Williamson v. Ward,* 110 F.3d

10

1508 (10th Cir. 1997); *Moore v. Johnson,* 194 F.3d 586 (5th Cir. 1999). All of these cases were decided under the *Strickland* standard and are instructive in applying that standard to Mr. Nelson's ineffective assistance claim

### 3    Mr. Nelson's Trial Counsel's Performance Was Deficient

61.    In this case, trial counsel completely failed to investigate the rape and present further evidence of how it might mitigate Mr. Nelson's actions to the jury. The jury had only the ambiguous statement in Mr. Nelson's confession and no link connecting the statement to the offense. Counsel failed to develop for the jury how it might be relevant to the offenses committed by Mr. Nelson. For the same reasons held to be insufficient in *Wiggins, Williams* and *Strickland,* any trial strategy cited by trial counsel would be inadequate to circumvent his obligation and duty to investigate this avenue. There is nothing in the record to indicate that he knew enough regarding to incident to forgo an investigation. On the contrary, there is plenty of evidence to indicate this would have been a worthwhile avenue to explore and to employ the services of a mental health expert to assist him.

62.    Although trial counsel requested a competency and sanity evaluation, the record does not indicate that trial counsel requested any money for an mental health expert. Without the aid of a mental health expert, counsel could not have had the necessary information required under *Strickland* in order to render effective assistance and counsel to Mr. Nelson on mitigation strategy.

11

63. Trial counsel's performance in failing to investigate and factual develop evidence of the rape was deficient. Counsel's failure to employ the assistance of a mental health expert to evaluate Mr. Nelson and advise counsel as to the potential of Mr. Nelson's behavior constituting an unconscious reaction to his traumatic past, was simply deficient. The first prong of *Strickland* has been met in Mr. Nelson's claim.

4) Counsel's Performance Prejudiced Mr. Nelson's Sentencing

64. Determining prejudice in a case requires a reasonable probability that but for the deficient performance, the outcome would have been different. *Strickland*, 466 U.S. at 694. This determination is evaluated in the context of the remaining evidence at trial.

Little was presented to the jury to explain Mr. Nelson's conduct. Although the defense attempted to present a human side to Mr. Nelson through family and friends, trial counsel never attempted to explain his conduct in a mitigating fashion, one that would lessen his moral blameworthiness. Evidence of his impulsive behavior toward homosexuals stemming from his childhood rape would have helped explain how Mr. Nelson actions were a causal result of a trauma he suffered as a child. Moreover, Nelson was never treated for the trauma and certainly never recovered from it. Instead, Nelson would suppress that trauma where it would continue to reappear and overwhelm him.

65. Had the rape evidence been developed and explained the outcome of punishment would have been different. His rape occurred when he was eleven. His mother stated she never had any problems until after he was 10 years old. The first homosexual assault occurred when Mr. Nelson was thirteen years old. He *never received any treatment for*

12

*this while at Giddings.* He assaulted two other victims who were also homosexuals. The connection between the trauma and the violent behavior is evident.

66.     The psychiatrist who examined the case stated that under these circumstances, Mr. Nelson suffered from unresolved issues as to his own sexual preference and the extreme emotional trauma that the rape and sodomy produced.   These issues manifested themselves in his compulsion, on the one hand, to engage in acting out the original trauma of his childhood molestation with his victims, and the other, being so repulsed by his own homosexual impulses, that it produced an uncontrollable rage. [see affidavits]

67.     All off his offenses fit into this same pattern.  However, the jury was never offered an explanation as to why the impulsive behavior is significant or how it could have been managed by treatment.  The jury did hear anything of this nature.

68.     The State Court Appeal's opinion held that the mitigation portion of the trial was not sufficient to warrant a *Penry* charge.[2]  While not conceding that the Court of Criminal Appeals was correct in this conclusion, should this court choose to agree, the opinion would serve as direct support for claim on ineffective assistance of trial counsel for failing to investigate and present evidence at adequate mitigation.   As the criminal

---

[2] To be sure, appellant's confession does intimate that he was sexually molested in some manner as a child. But it does not describe the nature or the source of such abuse, even though it is plain that he was embarrassed by the encounter  Indeed, it is not even necessarily an inference from his confession that the person who "molested" him was acting illegally.  For all  we know, such abuse may have been limited to a vulgar remark, an indecent exposure or a suggestive proposition. Without some further evidence of significant moral dysfunction attributable to the experience, we are unwilling to conclude that an isolated an unexplained event producing irrational hatred for a whole class of people is quite the kind of mitigating circumstance envisaged by the United States Supreme Court in Penry.

Certainly we do not mean to diminish the seriousness of child abuse, whether physical, sexual, or psychological. But appellant has provided far too little information about his alleged mistreatment as a child to raise a bona fide issue that his fault for the brutal murder of James Randle Howard was ameliorated at all by an impairment of conscience or character arising from it. Accordingly, we hold that no issue making necessary an extra-statutory jury instruction on moral culpability was fairly raised by the evidence

13

appeals noted, more evidence to develop this factor would have permitted reversal for failing to give an adequate mitigation instruction to the jury. Furthermore, whether one agrees that the evidence presented rose to the level required by *Penry*, it can not be disputed that the court was accurate in observing that the evidence of the rape could have been developed further. Either way, Mr. Nelson was prejudiced by trial counsel's performance at sentencing and on his appeal.

## ISSUE NUMBER 3

**MR. NELSON'S RIGHTS UNDER THE EIGHTH AMENDMENT TO THE U.S. CONSTITUTION WERE VIOLATED DURING THE PUNISHMENT PHASE OF HIS TRIAL WHEN THE JURY WAS NOT INSTRUCTED THAT IT COULD CONSIDER AND GIVE EFFECT TO ALL MITIGATION EVIDENCE PRESENTED**

**MR. NELSON'S RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION RIGHTS UNDER THE UNITED STATES CONSTITUTION WERE VIOLATIOED WHEN TRIAL COUNSEL FAILED TO REQUEST A MITIGATION INSTRUCTION**

69.     The only instruction requested and received to guide the jury on mitigation was the following:

> In determining the answer to special issues, you may consider the entire evidence and mitigation of punishment such as the defendant's age, family history, social background, drug use and intoxication to assist you.

(CR I at 3084-3090).  This charge was woefully insufficient to allow the jury to properly consider mitigation evidence.  The main component lacking was an instruction for the jury that though the answers to special issues one and two *should be* yes, that it could still consider the mitigating evidence, and answer the questions "no" and return a life sentence.  However, nothing in the specific charge requested allowed the jury to elect life due to the mitigating evidence and the jury had no avenue for evaluating the evidence that presented itself as a double edged sword, as noted in *Penry I.*

1.     <u>Penry I and its application</u>

15

70.     In *Penry v. Lynaugh*, 491 U.S. 109 301 (1989), the United States Supreme Court

held that the standard instructions given to a capital jury in Texas were not constitutional

under the Eighth Amendment because the jury was never instructed that it could consider

and give effect to the evidence offered by Mr. Penry as *mitigating* evidence. *Penry*, 491

U.S. at 320.

The Court noted:

> In the absence of jury instructions defining "deliberately" in a way
> that would clearly direct the jury to consider fully Penry's mitigating
> evidence as it bears on his personal culpability, we cannot be sure that the
> jury was able to give effect to the mitigating evidence of Penry's mental
> retardation and history of abuse in answering the first special issue. Without
> such a special instruction, a juror who believed that Penry's retardation and
> background diminished his moral culpability and made imposition of the
> death penalty unwarranted would be unable to give effect to that conclusion
> if the juror also believed that Penry committed the crime "deliberately."
> Thus, we cannot be sure that the jury's answer to the first special issue
> reflected a "reasoned moral response" to Penry's mitigating evidence.

*Penry I,* 491 U.S. at 323. Because the jury was asked to answer the same special issue on

deliberateness in this case, without the separate mitigation charge, the jury charges were

constitutionally deficient for the same reasons. The jury in Mr. Nelson's case could not

have given effect to the evidence of Mr. Nelson's abusive childhood, sexual assault, and

social background resulting in his diminished culpability if they believed the crime was

committed deliberately as defined in the first special issue.


71.     The *Penry I* court also addressed the future dangerousness, instruction and it held

it was insufficient as follows:

Penry's mental retardation and history of abuse is thus a two-edged sword: it may diminish his blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future.

72. The evidence presented as to Mr. Nelson's past is similarly characterized as a two-edged sword. The jury could well have believed that the repeated violent acts by stemmed from the prior sexual assault and so he posed a future danger, resulting in a "yes" to the special issue on future dangerousness.

73. This charge wholly fails to allow the jury to "give effect" to the mitigation evidence, as required under the Eighth Amendment. The *Penry I* court noted the following Constitutional safeguards in death penalty cases have been established in the Court's jurisprudence:

> "In contrast to the carefully defined standards that must narrow a sentencer's discretion to *impose* the death sentence, the Constitution limits a State's ability to narrow a sentencer's discretion to consider relevant evidence that might cause it to *decline to impose* the death sentence." *McCleskey v. Kemp*, 481 U.S. 279, 304 (1987) (emphasis in original). Indeed, it is precisely because the punishment should be directly related to the personal culpability of the defendant that the jury must be allowed to consider and give effect to mitigating evidence relevant to a defendant's character or record or the circumstances of the offense. Rather than creating the risk of an unguided emotional response, full consideration of evidence that mitigates against the death penalty is essential if the jury is to give a " 'reasoned *moral* response to the defendant's background, character, and crime.'" *Franklin*, 487 U.S.    , 108 S.Ct. at 2333. (O'CONNOR, J., concurring in judgment) (quoting *California v. Brown*, 479 U.S. at   , 545, (O'CONNOR, J., concurring)). In order to ensure "reliability in the determination that death is the appropriate punishment in a specific case," [citation omitted], the jury must be able to consider and give effect to any mitigating evidence relevant to a defendant's background and character or the circumstances of the crime.

74.     The Court then held that without a separate instruction that the jury could consider *and give effect* to the mitigating evidence, the jury was not provided with a vehicle for expressing its "reasoned moral response" to that evidence in rendering its sentencing decision.

75.     The Court further noted that in two death penalty cases, *Lockett v. Ohio,* 438 U.S. 586 (1978), *Eddings v. Oklahoma,* 455 U.S. 104 (1982), remand for resentencing was required so that we do not "risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty." *Locket,* 438 U.S. at 605; *Eddings,* 455 U.S. at 119 (O'CONNOR, J., concurring). "When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments." *Lockett,* 438 U.S. at 605.

76.     *Penry I* is instructive in understanding the inadequacy of the jury instruction in Mr. Nelson's case. Because of the faulty instruction, the jury lacked sufficient guidance to evaluate with the mitigating evidence. In light of the extraneous offenses and the gratuitous character assassination by the TYC staff, Nelson had no assurance that the jury could even note the mitigation evidence in his background, let alone reach a "reasoned moral response." Thus, there is no certainty the instruction prevented the jury from resorting to an unguided emotional response to all the evidence launched against Mr. Nelson in sentencing the 19 year old to death. This conclusion finds further support in *Penry II.*

2.    *Penry II and its application*

77.    The Court revisited the case in 2001 in *Penry v. Johnson*, 532 U.S. 782 (2001). This time, Mr. Penry's jury was additionally instructed as follows;

> "If you find that there are any mitigating circumstances in this case, you must decide how much weight they deserve, if any, and therefore, give effect and consideration to them in assessing the defendant's personal culpability *at the time you answer the special issue.* If you determine, when giving effect to the mitigating evidence, if any, that a life sentence, *as reflected by a negative finding to the issue under consideration,* rather than a death sentence, is an appropriate response to the personal culpability of the defendant, *a negative finding should be given to one of the special issues.*"

*Penry v. Johnson,* 532 U.S. at 797, 798.

78.    For the second time, the Supreme Court ruled that this instruction was unconstitutional under the Eighth Amendment and the Court cited the same reasoning it had announced in *Penry I.*

> While the latter seems to be more likely, to the extent it was the former, the Texas court clearly misapprehended our prior decision. *Penry I* did not hold that the mere mention of "mitigating circumstances" to a capital sentencing jury satisfies the Eighth Amendment. Nor does it stand for the proposition that it is constitutionally sufficient to inform the jury that it may "consider" mitigating circumstances in deciding the appropriate sentence. Rather, the key under *Penry I* is that the jury be able to "consider and *give effect to* [a defendant's mitigating] evidence in imposing sentence." [citations omitted]. See also *Johnson v. Texas,* 509 U.S. 350, 381 (1993) (O'CONNOR, J., dissenting) ("[A] sentencer [must] be allowed to give *full* consideration and *full* effect to mitigating circumstances" (emphasis in original)). For it is only when the jury is given a "vehicle for expressing its

19

'reasoned moral response' to that evidence in rendering its sentencing decision," [citation omitted] that we can be sure that the jury "has treated the defendant as a 'uniquely individual human bein[g]' and has made a reliable determination that death is the appropriate sentence." [citations omitted).

*Penry v. Johnson*, 532 U.S. at 797. Then court then went on to address the argument asserted by the State to support the sufficiency of the instructions. The court's treatment of the first argument points out exactly what is lacking in Mr. Nelson's charge:

> First, as the portions italicized above indicate, it can be understood as telling the jurors to take Penry's mitigating evidence into account in determining their truthful answers to each special issue. Viewed in this light, however, the supplemental instruction placed the jury in no better position than was the jury in *Penry I.* As we made clear in *Penry I* none of the special issues is broad enough to provide a vehicle for the jury to give mitigating effect to the evidence of Penry's mental retardation and childhood abuse. [citations omitted] In the words of Judge Dennis below, the jury's ability to consider and give effect to Penry's mitigating evidence was still "shackled and confined within the scope of the three special issues." [citation omitted] Thus, because the supplemental instruction had no practical effect, the jury instructions at Penry's second sentencing were not meaningfully different from the ones we found.

79.     The special issues in this case, the same considered in *Penry*, merely instructs jurors to take into account mitigating evidence in determining their truthful answer to each special issue, but completely failed to provide a means to give effect to the mitigating evidence.

> 3. The evidence at sentencing was *Penry*-type evidence that warrants an extra statutory instruction.

80.     Mr. Nelson presented evidence of child abuse from his father. sexual abuse from a stranger, lack of emotional support from his stepfather, drugs abuse. and unstable childhood.  Courts have held repeatedly that these factors are mitigation as long as there is a nexus to the criminal behavior.  Mr. Nelson's statement supplied the nexus to his behavior and the rape.   His statement established that he was on drugs when he committed the offense.    These factors read in conjunction with his abuse and dysfunctional upbringing further link the evidence to the behavior.

81.     The Court of Criminal Appeals looked at the mitigating factors individually to arrive its conclusion. These factors however, should be considered in sum.  In *Penry I,* the court did not discuss the defendant's childhood abuse and retardation individually or in a vacuum.

82.     Although the jury heard testimony about Mr. Nelson's background, it did not know what to do with the information because of the inadequate instruction. Moreover, several of the factors though mitigating were double edged swords that could provide evidence of future danger.  Just as in *Penry I* and *Penry* II, there was no vehicle to consider a life sentence. The court requires a more explicit instruction so the jury understands what it can do with the mitigating evidence.

83.     Under the Eighth Amendment, Mr. Nelson is entitled to have the evidence introduced during sentencing considered as mitigation which could lessen his moral blameworthiness and warrant a life sentence.  The Eighth Amendment principle that acknowledges "death is different" and requires a heightened reliability in death penalty

21

sentencing, requires that a jury is appropriately instructed and permitted to take into consideration the personal circumstances of the individual defendant whose life they are deciding. There can be no requisite *reliability* without a vehicle for the jury to consider and give effect to mitigation. As emphasized in the Supreme Court's *Penry* decisions, there is only one way to assure that the jury arrives at a reasoned moral response to the evidence presented in their verdict and that is by giving the jury the appropriate vehicle to consider the mitigation evidence.

### ISSUE NUMBER 4

### MR. NELSON'S FIRST AND FOURTEENTH AMENDMENT RIGHTS TO FREEDOM OF ASSOCIATION AND FREEDOM OF SPEECH UNDER *DAWSON V. DELAWARE*, 503 U.S. 159 (1992) WERE VIOLATED WHEN THE STATE INTRODUCED POSSIBLE RELIGIOUS AFFILIATION AT SENTENCING WITHOUT ANY EVIDENTIARY BASIS

**I.     Relevant Facts**

84.     During the state's case in chief at the punishment phase of Mr. Nelson's trial, the

prosecution called two witnesses who were employees of the Texas Youth Commission

who had worked at the Giddings School where Mr. Nelson was incarcerated.   One was

Bob Tally and the second was David Davis, who had served as a dormitory supervisor

when Mr. Nelson was incarcerated there[3].  (See ¶ 5.67).

---

[3] At this point in the testimony, defense counsel objected to the anticipated witness testimony contending that the testimony about to be adduced violated Tex. Code Crim. Proc. Art. 38.22 - admissibility of oral statements made by Mr. Nelson while he was in the custody of TYC.   The court overruled counsel's objection and allowed the testimony.  (See ¶ 5.70).  This was not the correct objection.

After the witness testified, defense counsel tried again:

> Number one, [in] consideration of the court's ruling regarding the testimony of David Davis and anything or any conversation that he may have had with Marlin Nelson, the defendant now re-urges his objection to the conversations specifically pointing to the relevancy of the testimony elicited concerning the devil worshipping and the idolization of Charles Manson.  Obviously this is calculated to inflame the jury.  It is not probative on any of the issues that the jury has to answer on punishment phase of this trial.  The testimony has been elicited in an attempt to establish some prejudice and bias against Marlin Nelson on matters which may or may not be factual; and, even testimony regarding the worship of Satan and Charles Manson is presumed to be a Charles Manson which the court and everyone else apparently knows is the California mass murderer, and to draw some analogy is just to probative.  We ask the court to instruct the jury, first of all, sustain our objection to the testimony elicited regarding that and to instruct the jury they're not to consider that for any purpose.

The court overruled the objection (See ¶ 5.72).

23

85.     Tally testified that he knew Mr. Nelson and that that during one of their discussions, Mr. Nelson stated that he admired a gentleman from another state named Charles Manson. Mr. Nelson reportedly told Mr. Tally that Charles Manson was a hero to him because he killed a lot of people. (See ¶ 5.61)

86.     The state also called Mr. Davis in the punishment phase. In response to the State's question, "Did he ever talk to about the type of worship he practiced?" the witness said, "Well, him and Lloyd Spray, another student, and I noticed that they were kind of worshipping the devil, you know. Devil worshipers." (See ¶ 5.70). The witness did not offer any examples of what actions Mr. Nelson took that caused the witness to conclude Mr. Nelson was "kind of worshiping the devil." In response to another question from the prosecution: "Did you ever talk to the defendant about Charles Manson?" Mr. Davis responded "Well, he talked to me about it. He told me that was his idol, one of his idols." (See ¶ 5.71)

87.     Mr. Nelson raised the claim in state habeas corpus proceedings. *See* Claims for Relief II – VII in Petition for Writ of Habeas Corpus. The trial court recommended that relief be denied because it incorrectly determined the evidence was properly admitted and that Mr. Nelson failed to show harm. *See* Findings of Fact and Conclusions of Law at 22-23.

**II.      The Principles of *Dawson v. Delaware*, 503 U.S. 159 (1992)**.

88.     In *Dawson v. Delaware*, 503 U.S. 159 (1992), the Supreme Court vacated the death sentence of David Dawson because the state introduced evidence of his association

24

with the Aryan Brotherhood during the punishment phase of his capital murder trial. The Court began by establishing that "the Constitution does not erect a per se barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment." *Id.* at 165. Such evidence can be admitted if it is "relevant to the issues involved" in a capital sentencing trial. *Id.*

89.     At trial the defense, pursuant to a bargain struck with the state to avoid testimony by an expert witness concerning the Aryan Brotherhood, agreed to allow the following stipulation to be read to the jury:

> The Aryan Brotherhood refers to a white racist prison gang that began in the 1960's in California in response to other gangs of racial minorities. Separate gangs calling themselves the Aryan Brotherhood now exist in many state prisons including Delaware.

*Id.* at 162. Because the jury was furnished with so little information about the Aryan Brotherhood or Dawson's involvement with it, the state's argument that the evidence was relevant was seriously weakened. *See id.* at 162-63. The Court declared that is was left with the belief that the state had introduced the evidence not because of its relevance to the proceedings, but rather simply because the "jury would find these beliefs morally reprehensible." *Id.* at 166.

90.     The decision of whether such evidence is relevant must be determined by a context-sensitive balancing test. The Court left no doubt that the beginning of the analysis must be a recognition that membership in the Aryan Brotherhood is protected by

the First Amendment. *Id.* at 167 (concluding that "Dawson's First Amendment rights were violated by the admission of the Aryan Brotherhood evidence in this case"). However, the Court rejected Dawson's submission that such protection was absolute. In fact, the Court explained several situations in which the Aryan Brotherhood evidence would have become so indisputably relevant to a determination of his future dangerousness that the State's interest in proffering it would outweigh Dawson's First Amendment rights.

91.    First, the evidence may have been relevant if Dawson's Aryan Brotherhood evidence was "tied in any way to the murder of Dawson's victim." *Id.* at 166. The Court noted that it had approved a showing that a black defendant was a member of the Black Liberation Army when he murdered a white woman with the specific intent to start a race war. *Id* (distinguishing *Barclay v. Florida*, 463 U.S. 939, 949 (1983)). Second, the Court noted that if the state had introduced evidence that the Aryan Brotherhood had committed or endorsed violent acts, then the evidence might have become relevant. *Id.* (hypothesizing that if the state had shown the Brotherhood "endorses the killing of any identifiable group" the evidence would be relevant).

**III.    Application of Dawson to Events at Mr. Nelson's Trial.**

**A.    A belief in Satanism is protected by the First Amendment**

92.    The analysis of a *Dawson* claim requires two steps. First, a court must determine whether the evidence introduced by the State was in fact evidence of associations protected by the First Amendment. *See Dawson*, 503 U.S. 159, ___, 112 S. Ct. 1093,

26

1096-97 (determining that Dawson's membership in the Aryan Brotherhood is an association protected by the First Amendment). Courts have extended First Amendment protection to gender orientation, *Beam v. Paskett*, 3 F.3d 1301, 1309 (9th Cir. 1993) (analogizing Aryan Brotherhood membership to evidence of a defendant's "non-violent, consensual or involuntary sexual conduct"), cult membership, *Flanagan v. State*, 846 P.2d 1053, 1057-59 (Nev. 1993) (holding that evidence of appellant's membership in a cult was irrelevant when the only motive ever advanced by the state was greed), and even mere choice of friends and associates, *State v. Pratt*, 873 P.2d 800, 816 (Idaho 1993) (noting that the defendant's knowledge that the associate was a "convicted and escaped spy and bank robber" was relevant in assessing punishment). Practice of or a belief in "Satanism" or "devil worship," while perhaps not recognized as a formal religion, has been acknowledged by federal courts as being worthy of First Amendment protection. *See, e.g., Carpenter v. Wilkinson*, 946 F.Supp 522, 526-9 (N.D. Ohio, East. Div. 1996) ("Satanism appears to have at least some of the indicia of a religion. . .the practice of which is protected by the First Amendment.")

**B.    The State did not demonstrate that the fact that Mr. Nelson may have believed in Satanism and admired Charles Manson was relevant to any issue at punishment.**

93.    Once it is determined that the proposed evidence implicates the First Amendment, a reviewing court must determine whether the State's laid a proper foundation for the evidence by tying it to issues relevant *at sentencing*. It is imperative to recognize this

27

distinction--whether references to Mr. Nelson's beliefs about Satansim or Charles Manson would aid the jury in determining whether he was guilty of the acts with which he was charged is an *entirely different* question from whether this evidence would aid the jury in answering Texas' special issues and thus determining whether he should live or die. The analysis of *Dawson* claims relating to evidence proffered during the guilt/innocence phase of a trial is wholly distinct from the analysis to be applied when the evidence is put forward at punishment.

94. Because the evidence provided nothing more than what may or may not have been Mr. Nelson's abstract beliefs when he was younger, the trial court should have excluded the testimony and ordered the jury to ignore it. There was no evidence, if those indeed were Mr. Nelson's beliefs, that they served as a motive for or had any impact on the murder.

95. Neither was the evidence introduced for the purpose of rebutting mitigating evidence produced by the defense. The defense presented punishment evidence regarding Mr. Nelson's positive traits, mitigating reasons for the offense, his good behavior while incarcerated and his home life and background. The Court noted in *Dawson*:

> We have held that a capital defendant is entitled to introduce any relevant mitigating evidence that he proffers in support of a sentence less than death. *Eddings v. Oklahoma*, 455 U.S. 104 (1982); *Lockett v. Ohio*, 438 U.S. 586 (1978) (plurality opinion). But just as the defendant has the right to introduce any sort of relevant mitigating evidence, the State is entitled to rebut that evidence with proof of its own. See *Payne v. Tennessee*, 501 U.S., at 825 ("The State has a legitimate interest in counteracting the mitigating evidence which the

defendant is entitled to put in") (quotation omitted); id., at 860 (STEVENS. J., dissenting).

96.     The prosecution advanced the position that because the defendant may have practiced "Devil worship," which is not a mainstream religion, he was not entitled to the protection offered by the Free Exercise Clause of the First Amendment. The purpose of the state in introducing testimony on the subject was offered only for the purpose of inflaming the jury, who would no doubt find the defendant's purported beliefs reprehensible. The prosecutor invited the jury to make a leap from their distaste for Mr. Nelson's religious beliefs to finding he deserved the death penalty. In effect, suggesting to the jury that Mr. Nelson deserved to be executed for those beliefs.

97.     The state could perhaps have legitimized neutral references to Mr. Nelson's beliefs by introducing evidence that Satanism promotes violence or indeed that Mr. Nelson had been seen performing violent acts under the guise of Satanism or attempting to emulate Charles Manson.  See, e.g., *Fuller v. Johnson*, 1997 WL 289347, at *5:

> The State in Fuller's case did not merely stipulate that Fuller was in the
> Aryan Brotherhood.  It introduced evidence that Fuller was a member of a
> gang that had committed unlawful or violent acts, including homicides,
> multiple stabbings, drug dealing, and aggravated assaults.

98.     Because the prosecution had introduced this evidence, "[a] reasonable juror could conclude that membership in such a gang is relevant to future dangerousness." *Id.*  Had the prosecution introduced such evidence at Mr. Nelson's trial, his beliefs could have been relevant. It did not. Thus, it did not do what was needed to make the references to

29

Mr. Nelson's beliefs about devil worship and Charles Manson, relevant: prove that he engaged in violent practices in the past as a result of them or that he posed more of a risk to society in the future because of these beliefs. The prosecution certainly did not have to ask the two TYC employees specifically about comments Mr. Nelson made about Charles Manson or unpopular religious beliefs he may have espoused. In order to respect the First Amendment rights of criminal defendants, a state must do one of two things: either (1) prove why a defendant's first amendment associations are relevant to sentencing, and then discuss them; or (2) not mention them at all, except by incidental, neutral references for legitimate reasons. Here, the state chose a third path which is not permitted by the First and Fourteenth Amendments.

## IV. Conclusion

99.     The Fifth Circuit, not finding *Dawson* error in a case, has yet to rule on the issue of whether *Dawson* error is subject to harmless-error analysis. *See Fuller*, 1997 WL 289347, at *5; *Boyle v. Johnson*, 3 F.3d 180, 185 (5th Cir. 1996) (holding evidence of petitioner's sexual habits relevant to future dangerousness because underlying capital murder involved sex and prosecution proved Boyle's sexual fantasies had a violent component).

100. Justice Blackmun, concurring in the judgment, argued that *Dawson* error should not be subject to harmless error analysis, because the prosecution's use of protected associations against a defendant to advocate for the death penalty violates "rights [that] protect important values that are unrelated to the truth-seeking function of the trial.". *Dawson*, 503 U.S. 159, 169 (1992) (Blackmun, J., concurring) (citing *Rose v. Clark*, 478 U.S. 570, 587 (1986) (Stevens, J., concurring in judgment)). The Supreme Court has repeatedly noted that determining the impact of error in capital sentencing proceedings is a delicate matter. In *Satterwhite v. Texas*, 486 U.S. 249, 258 (1988), Justice O'Connor wrote for the Court that "the evaluation of the consequences of an error in the sentencing phase of a capital case may be more difficult because of the discretion that is given to the sentencer." Nevertheless, the Court held the error in that case to be subject to harmless-error analysis. In *Clemons v. Mississippi*, 494 U.S. 738 (1990), the high Court, while finding the error in that case subject to harmless-error analysis, discussed harmless-error review in capital sentencing in hesitant tones:

> Nothing in this opinion is intended to convey the impression that state appellate courts are required to or necessarily should engage in reweighing of harmless error analysis when errors have occurred in a capital sentencing proceeding. Our holding is only that such procedures are constitutionally permissible. In some situations, a state appellate court may conclude that peculiarities in a case make appellate reweighing or harmless error analysis extremely speculative or impossible.

*Id.* at 754. In Mr. Nelson's case, it is impossible to determine what role the "devil worship" and Charles Manson evidence played in his death sentence. Texas

juries are not required to spell out the specific aggravating factors they have found (other than the general special questions).

101.    The nature of the error in Mr. Nelson's trial provides another argument for declaring the error harmful.    Justice Blackmun issued a concurring opinion in *Dawson* in order to emphasize that "the potential chilling effect that consideration of First Amendment activity at sentencing might have [gives rise to] a substantial argument that harmless-error analysis is not appropriate for the type of error before us today." *Dawson*, 503 U.S. at 169 (Blackmun, J., concurring).  Declaring certain fundamental constitutional errors so important that they must always be considered harmful helps to prevent prosecutors from "subordinat[ing] the interest in respecting the Constitution to the ever-present and always powerful interest in obtaining a conviction [or death sentence] in a particular case." *Rose*, 570 U.S. at 589.

102.    In *Zant v. Stephens*, 462 U.S. 862 (1983), the Supreme Court strongly hinted that using conduct protected by the First Amendment as an aggravating circumstance in capital sentencing merited automatic vacatur of a death sentence. As noted above, that Court distinguished the kind of error before it (an unconstitutionally vague aggravating factor) from error that punishes constitutionally protected activity.  If Georgia had "attached the 'aggravating' label to factors . . . such as for example the race, religion, or political affiliation of the defendant, . . . ***due process of law would require that the jury's decision to impose death be set aside***." *Id.* at 885 (emphasis added).  No mention whatever is

made of a harmless-error analysis. Certain capital sentencing errors may be discrete mistakes that merely affect the reliability of the sentencing decision. In these decisions, "careful scrutiny of in the review of any colorable claim of error" (*id.*) may be enough to ensure that justice is done. ***Dawson*** error, though, involves values unrelated to reliability: it implicates every citizen's right not to be punished for constitutionally protected behavior, no matter how unpopular. The case for holding the error not subject to harmless error analysis is strengthened by claims such as Mr. Miller-El's, which is more sensitive than Dawson's claim because the prosecution intruded into the especially sensitive area of religious belief. Both for prophylactic reasons and for reasons of principle, it should be declared *per se* harmful.

The state court's determination that Mr. Nelson's claim was subject to harmless error analysis was incorrect.

Because Mr. Nelson's death sentence was handed down in violation of the First and Fourteenth Amendments to the United States Constitution, it must be set aside.

## ISSUE NUMBER 5

**MR. NELSON WAS DENIED HIS RIGHT TO A FAIR TRIAL DURING THE PUNISHMENT PHASE WHEN THE PROSECUTION INTRODUCED IRRELEVANT EVIDENCE THAT CHARLES MANSON WAS AN IDOL OF MR. NELSON'S, IN VIOLATION OF MR. NELSON'S FIRST AMENDMENT RIGHT TO FREEDOM OF SPEEACH AND FREEDOM OF THOUGHT AND HIS FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS AND EQUAL PROTECTION**

103.    During the punishment stage of the trial, the prosecution called Bob Tally

and David Davis from Giddings State School. Both gentlemen testified that they

knew Mr. Nelson from Giddings and both had a conversation with Mr. Nelson

where Mr. Nelson told them Charles Manson was a hero and or an idol to him.

Charles Manson was a convicted serial murderer from the 1970's with cult like

followers who he allegedly mesmerized with drugs, sex, and religion. (*The*

*People's Chronology*, 1995, 1996).

104.    Trial counsel launched an objection to relevancy and the probative value of

the testimony and asked the court to instruct the jury to disregard the evidence it

heard regarding Charles Manson.

105.    In *Dawson v. Delaware*, 503 U.S. 159 (1992), the Court stated that "[A]

defendant's abstract beliefs, however obnoxious to most people, may not be taken

into consideration by a sentencing judge. In *Dawson*, the prosecution introduced

evidence at a capital sentencing hearing that the defendant was a member of a

white supremacist prison gang. Because the "evidence proved nothing more than

[the defendant's] abstract beliefs," the Court ruled that its admission violated the defendant's First Amendment rights. *Dawson*, 503 U.S. at 167.

106.    There are no indications that the above testimony was remotely relevant to the circumstances of Mr. Nelson's offenses. No evidence links Mr. Nelson to the Manson family. Likewise, there is no evidence that even remotely suggests that the offense for which Mr. Nelson was convicted was copied or was inspired by the Manson Family and their crime spree committed before Mr. Nelson was born. Thus, the alleged unsubstantiated idolization of Charles Manson is not probative of the special issues. The evidence was merely calculated to perpetuate the image of an evil and unredeemable 13 year old boy, and play to the emotions of a jury. This type of evidence does not only violate Mr. Nelson's freedom's under the First Amendment, but threatens his Eighth Amendment protections mentioned in the previous argument's discussion of *Penry I* and *Penry II* as it sole purpose is to scare the jury into sentencing Mr. Nelson to death as disregard any mitigating evidence.

107.    The fact that these statements were just that, mere statements, without any substantive proof of their truth, poses an even more serious threat to Mr. Nelson's First Amendment Freedoms. It is the quintessential example of being punished for one mere "abstract belief." *See Wisconsin v. Mitchell*, 508 U.S. 476, 485-486 (1993). To allow the State to introduce this type of constitutionally inadmissible evidence during the sentencing portion of a capital murder trial gives the state the permission to execute an individual for harboring an abstract thought.

## ISSUE NUMBER 6

**MR. NELSON WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHERE TRIAL COUNSEL DID NOT CONTEMPORANEOUSLY OBJECT TO THE STATE PRODUCING IRRELEVANT AGGRAVATING EVIDENCE AT THE PUNISHMENT STAGE CONCERNING DEVIL WORSHIPPING, WHEN SUCH EVIDENCE WAS NOT RELEVANT TO ANY OF THE SPECIAL ISSUES AS APPLIED SPECIFICALLY TO MR. NELSON.**

108. At the close of cross examination, defense counsel approached the bench

and made the following objection:

Number one, [in] consideration of the court's ruling regarding the testimony of David Davis and anything or any conversation that he may have had with Marlin Nelson, the defendant now re-urges his objection to the conversations specifically pointing to the relevancy of the testimony elicited concerning the devil worshipping and the idolization of Charles Manson. Obviously this is calculated to inflame the jury. It is not probative on any of the issues that the jury has to answer on punishment phase of this trial. The testimony has been elicited in an attempt to establish some prejudice and bias against Marlin Nelson on matters which may or may not be factual; and, even testimony regarding the worship of Satan and Charles Manson is presumed to be a Charles Manson which the court and everyone else apparently knows is the California mass murderer, and to draw some analogy is just to probative. We ask the court to instruct the jury, first of all, sustain our objection to the testimony elicited regarding that and to instruct the jury they're not to consider that for any purpose (See ¶ 5.72).

The court overruled the objection (See ¶ 5.72).

109. The legal arguments and law at to violations of Mr. Nelson's constitutional

rights under Dawson v. Delaware as discussed above are incorporated by reference

here.

110. Mr. Nelson, avers that the testimony adduced at trial concerning his alleged

devil worshipping was protected by the First and Fourteenth Amendments, that the

36

state did not show how the testimony related to the punishment phase of the trial and was therefore inadmissible.

111.    Counsel owes the accused a duty of competent representation.  This is particularly true in a trial case, because "there is a significant difference between the death penalty and the lesser punishments." *Beck v. Alabama*, 447 U.S. 625, 637 (1980).  The constitutional standard for judging the effectiveness of counsel under the sixth amendment is a two-prong test, requiring that the petitioner show: (i) counsel's performance was so "deficient," that is, that the counsel did not provide "reasonable effective assistance," and (ii) that the counsel's errors "prejudiced the defense by depriving the defendant of a fair trial whose result is reliable.  An attorney is ineffective if he or she "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, at 688. (1984).

112.    In establishing ineffective assistance of counsel, the burden is on the defendant to show that counsel's performance fell below an objective standard of reasonableness and that but for counsel's deficient performance the result of the proceedings would have been different.  *Strickland v. Washington*, id.;  Further, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 *U.S.* at 689.

113.    Mr. Nelson's trial attorneys should have objected immediately to that testimony which was not relevant to the issues in the trial, the prejudicial effect of

this devastating evidence greatly outweighs any probative value and also violates Mr. Nelson's constitutional right to Free Exercise of Religion. U.S. Constitution Amend. 1.; Tex. R. Crim. Evid. R. 403. Mr. Nelson's trial attorneys were ineffective under the first prong of the *Strickland* test.

114. The testimony adduced at the punishment stage of the trial was so fundamentally tainted, in that, as described above, invited the jury to sentence Mr. Nelson to death based solely or in part, because of his constitutionally protected beliefs. Thus, counsel's errors prejudiced the defense by depriving the defendant of a fair trial whose result is reliable.

115. Mr. Nelson was denied fundamental due process when the jury, in deciding whether he would live or die, was allowed to consider without limitation, Mr. Nelson's abstract beliefs in determining Mr. Nelson's future dangerousness.

116. Mr. Nelson was deprived of his rights as guaranteed by U.S. Const. Amend. I, V. VI, VIII, and XIV, by his counsel failing to provide him with effective counsel as guaranteed by the Sixth Amendment.

## CONCLUSION

In view of the foregoing claims, this Court should grant Mr. Nelson's petition and vacate Mr. Nelson's sentence.

## PRAYER FOR RELIEF

Wherefore, Premises Considered, petitioner Marlin Enos Nelson prays that this Honorable Court:

(1)     Order and conduct an evidentiary hearing at which additional proof may be offered supporting the allegations of this petition;

(2)     Vacate Mr. Nelson's conviction for capital murder and sentence of death, or, in the alternative, vacate the judgment affirming his conviction and sentence on direct appeal;

(3)     Issue a writ of habeas corpus releasing Mr. Nelson from custody, unless the State grants him a new trial, or, in the alternative, a new direct appeal;

(4)     Allow Mr. Nelson a reasonable period of time in which to amend this petition, that he may pursue all of his claims for relief in a single proceeding;

(5)     Allow Mr. Nelson a reasonable period of time and an opportunity to submit memorandum of law briefing all of the issues in this petition following an evidentiary hearing, and an opportunity for oral argument;

(6)     Grant such other relief as law and justice require.

Repectfully submitted,

Jerome Godinich, Jr.
TBN 08054700
929 Preston, Suite 200
Houston, Texas 77002
(713) 237-8388
(713) 224-2889 Fax.

Certificate of Service

I hereby certify that an accurate copy of the forgoing Petition for Writ of Habeas Corpus was served by overnight mail on the _15-th_ day of _August_, 2003, to Assistant Attorney General Katherine Hayes and Janie Cockrell.